JAY CLAYTON
United States Attorney for the
Southern District of New York
By: BENJAMIN A. GIANFORTI
Assistant United States Attorney
26 Federal Plaza
New York, New York 10278
Tel. (212) 637-2490

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------- :

UNITED STATES OF AMERICA             :

                                     :    **VERIFIED COMPLAINT**
                                          **FOR FORFEITURE**
            v.                       :

116.69789026 BITCOIN FORMERLY ON     :
DEPOSIT IN KRAKEN ACCOUNT NO.             25 Civ. 8389
AA83 N84G GKPA 44KQ; and             :

16.69788416 BITCOIN CASH FORMERLY ON :
DEPOSIT IN KRAKEN ACCOUNT NO.
AA83 N84G GKPA 44KQ;                 :

                                     :
            Defendants-*in-rem*.
------------------------------------- X

       Plaintiff United States of America, by its attorney, Jay Clayton, United States Attorney for the Southern District of New York, for its verified complaint alleges, upon information and belief, as follows:

### I.    JURISDICTION AND VENUE

       1.    This is a civil action in rem commenced by the United States of America pursuant to Title 18, United States Code, Sections 981 and 982 and Title 21, United States Code, Sections 881 and 853, seeking the forfeiture of the following:

1

    a. 116.69789026 Bitcoin ("BTC") formerly on deposit in Kraken Account No. AA83 N84G GKPA 44KQ (the "Subject Kraken Account"); and

    b. 16.69788416 Bitcoin Cash ("BCH") formerly on deposit in the Subject Kraken Account;

(a. and b., together, the "Defendants-in-rem").

2. This Court has jurisdiction pursuant to Title 28, United States Code, Sections 1345 and 1355.

3. Venue is proper under Title 28, United States Code, Section 1355(b)(1)(A) because acts and omissions giving rise to forfeiture took place in the Southern District of New York.

4. The Defendants-*in-rem* are presently in the custody of the United States Department of Homeland Security, Homeland Security Investigations ("HSI").

## II. BACKGROUND

### A. Silk Road

5. Silk Road was an online "darknet" black market in operation from approximately 2011 to 2013. Silk Road was used by drug dealers and other unlawful vendors to distribute massive quantities of illegal drugs and other illicit goods and services. Silk Road was also a means for laundering the proceeds of narcotics distribution and the sale of other illicit goods and services.

6. Silk Road was designed to facilitate anonymous illegal transactions beyond the reach of law enforcement, including by hosting the site on the Tor network, an encrypted private network that permits its users to surf the internet anonymously through various means, including by concealing its users' identities and IP addresses.

7. The illegal nature of the items sold on Silk Road was readily apparent to any user browsing its offerings. The vast majority of goods for sale on that platform consisted of illegal

drugs, which were openly advertised on the site as such, and were immediately and prominently visible on the site's home page. The offerings for sale on the site at any single time amounted to multi-kilogram quantities of heroin, cocaine, and methamphetamine, as well as distribution quantities of other controlled substances, such as LSD.

8.  In addition to illegal narcotics, other illicit goods and services were openly sold on Silk Road, including illegal computer hacking services, malicious software (such as password-stealing programs), forged identity documents, stolen financial and/or identity information, and murder-for-hire or "hitman" services.

9.  Silk Road retained certain information regarding users that accessed the site. For example, each user's Silk Road profile listed "Items for sale," which detailed the items that the user offered for sale on Silk Road (e.g., various narcotics) and included the total amount of offers made by Silk Road buyers for each listing. Each user's profile also listed "Items sold" that maintained details regarding the user's sales on the platform.

10. Silk Road's "forum" also contained extensive guidance on how to evade law enforcement. It included, for instance, numerous posts by users offering advice to other users on how they should configure their computers so as to avoid leaving any forensic trace of their use of Silk Road.

11. The only form of payment accepted on Silk Road was the digital currency BTC.

12. Silk Road operated as an "escrow marketplace," where user funds were treated similarly to funds in a bank account. When users wished to add funds, the market provided a BTC "deposit address," similar to a bank account number. The market, which controlled this deposit address, received any funds sent to it and provided a corresponding credit to the user's escrow account.

13.     Once funds had been credited to a user's account, that user could purchase products from vendors operating on the Silk Road market. Upon completion of such a purchase, the market debited the order value from the user's account and credited the value to the vendor's account. Similar to intra-bank transactions, the ordering process required adjusting the balances recorded for the user's account and vendor's account; no BTC was actually transferred.

14.     Conversely, when users wished to withdraw funds, they provided a BTC "withdrawal address" to the market. The market would send the requested funds from its "cryptocurrency wallet" to that address and debit a corresponding amount from the user's account.

15.     Silk Road charged a commission for every purchase conducted by its users. The commission rate varied between approximately 8 to 15 percent per transaction.

16.     Further, during its operation, Silk Road made use of a so-called "tumbler" to process BTC transactions in a manner designed to obfuscate the tracking of individual transactions through the blockchain. As described on a Silk Road information, or "wiki," page, Silk Road's tumbler sent "payments through a complex, semi-random series of dummy transactions . . . making it nearly impossible to link your payment with any [BTC] coins leaving the site." In other words, if a buyer made a payment on Silk Road, the tumbler helped obscure any link between the buyer's BTC address and the vendor's BTC address so as to ensure anonymity on each end of the transaction. By default, all transactions on the BTC blockchain—a decentralized online ledger of all BTC transactions—are public, that is, anyone with the means of accessing the blockchain can trace all transaction activity on it. The purpose of Silk Road's tumbler was to make transactions within the Silk Road ecosystem more difficult, if not impossible, to trace on the blockchain, thus preserving the anonymity of Silk Road's buyers and sellers. On information and belief, an important and common function served by such tumblers is to assist with the concealment of

criminal proceeds and the promotion of criminal activity.

17. Beginning in or about November 2011, certain United States law enforcement agents made multiple undercover purchases of controlled substances from Silk Road vendors using the Silk Road platform. Some of those purchases were placed from the Southern District of New York. For several such purchases, the controlled substances purchased using the Silk Road platform were shipped by Silk Road vendors to the Southern District of New York.

B. Mt. Gox

18. Mt. Gox was a BTC exchange platform based in Tokyo, Japan that was launched in or about 2010.

19. Mt. Gox enabled its customers, for a fee, to exchange fiat currency, including United States dollars, with BTC. Customers could deposit, store, and withdraw their BTC and fiat currency over the internet through the Mt. Gox website.

20. In or about February 2014, Mt. Gox shut down and entered liquidation proceedings in Japan. The sudden shutdown caused Mt. Gox's estimated 750,000 customers to lose access to their accounts, preventing them from withdrawing their BTC from the exchange.

21. In or about 2018, the Japanese court overseeing the Mt. Gox liquidation appointed a Japanese attorney as Mt. Gox's Rehabilitation Trustee.[1] In or about 2021, a plan was approved wherein billions of dollars of BTC would be paid to satisfy approved claims. Creditors with approved claims were contacted by the Rehabilitation Trustee to verify their account information, and were ultimately informed that they may be eligible to receive a percentage of the funds they had previously held on the Mt. Gox platform at the time of liquidation in satisfaction

---

[1] A "Rehabilitation Trustee" is similar to a Chapter 11 or Chapter 7 Trustee in a federal bankruptcy proceeding, insofar as they help administer the estate and make payments to creditors.

of their bankruptcy claims.

22. The Mt. Gox Rehabilitation Trustee selected U.S.-based cryptocurrency exchange Kraken, among other exchanges, to receive distributions by the Trustee to Mt. Gox's creditors.

23. In or about July 2024, the Mt. Gox Rehabilitation Trustee made a large, lump sum transfer of BTC and BCH to Kraken in satisfaction of multiple Mt. Gox creditors' claims

III. **PROBABLE CAUSE FOR FORFEITURE OF THE DEFENDANTS-IN-REM**

24. Among Silk Road's users were the users "DRamsterdam" and "harrynak," which, on information and belief, were different aliases used by the same individual or group of individuals. For example, on or about February 27, 2013, the user of the "harrynak" account sent a message to Silk Road's administrators claiming that he/she was "the owner of dramsterdam." In this message, the user of the harrynak account expressed concern that a computer that had been used to access the DRamsterdam Silk Road account may have been seized during a police raid of "the place where the dr's orders are packed" while DRamsterdam was still signed into Silk Road. The user of the harrynak account, in substance, asked Silk Road's administrators to remotely log DRamsterdam out of that account, presumably to prevent law enforcement from gaining access to the information in DRamsterdam's account from the seized laptop.

25. During the period that DRamsterdam was actively selling controlled substances on Silk Road, DRamsterdam conducted thousands of sales of controlled substances. Between approximately September 2011 to February 2013, DRamsterdam sold multiple controlled substances on the Silk Road platform, including cocaine, LSD, and MDMA, to, among others, U.S. customers, in exchange for BTC. Cocaine, LSD, and MDMA are all controlled substances under the federal Controlled Substances Act. During this period, DRamsterdam took in tens of

thousands of BTC, nearly all of which were tied to sales of controlled substances. On several occasions, the DRamsterdam user account transferred some of these narcotics proceeds to the harrynak user account, which further indicates that the same individual or group controlled both accounts.

26. On or about March 31, 2012, an individual opened an account at Mt. Gox under the name "chefkolonel" (the "Chefkolonel Mt. Gox Account"). Between on or about March 31, 2012 and April 18, 2012, the Silk Road user harrynak sent approximately 2,250 BTC in two tranches to the Chefkolonel Mt. Gox Account.

27. As set forth below, on or about October 26, 2012, approximately 4,999 BTC derived from DRamsterdam's narcotic sales on Silk Road were transferred to the Chefkolonel Mt. Gox Account:

a. On or about December 20, 2011, the user of the DRamsterdam Silk Road account transferred approximately 6,000 BTC derived from the sale of narcotics to an unhosted BTC wallet with no prior balance ("Unhosted Wallet-1"). No further deposits were made into Unhosted Wallet-1 in the ensuing months. On or about April 24, 2012, approximately 5,400 of the approximately 6,000 BTC in Unhosted Wallet-1 were transferred to another unhosted BTC wallet with no prior balance ("Unhosted Wallet-2").

b. On or about January 31, 2012, the Silk Road user DRamsterdam transferred approximately 8,000 BTC derived from the sale of narcotics to Unhosted Wallet-2.

c. Beginning on or about July 13, 2012, and over the course of the next two months, the funds in Unhosted Wallet-2 were moved at somewhat regular intervals, over approximately seven transactions, to new unhosted BTC wallets. Each time, a portion of the funds, ranging from approximately 500 to 1,700 BTC, was siphoned off and returned to Silk Road, principally to the

Silk Road account "nakharry." Beyond sharing a similar name to the Silk Road user harrynak, the two accounts also sent BTC back and forth on at least two occasions in or about 2012. On information and belief, the siphoning off of funds described above is a common money laundering technique known as a "peel chain" that is used to make illicit proceeds more difficult to trace and seize.

        d. By on or about September 12, 2012, approximately 5,506.5 BTC from the original approximately 13,400 BTC derived from DRamsterdam's narcotic sales that were pooled in Unhosted Wallet-2 earlier in or about 2012 had not been "peeled" off and remained outside the Silk Road environment in another unhosted BTC wallet ("Unhosted Wallet-3"). On or about September 27, 2012, approximately 5,000 of these BTC were transferred to another unhosted BTC wallet ("Unhosted Wallet-4") and approximately 506.5 BTC were peeled off and transferred back to the nakharry Silk Road account. In other words, Unhosted Wallet-4 was the end of the DRamsterdam-nakharry peel chain.

        e. On or about October 26, 2012, approximately 4,999 of the 5,000 BTC transferred to Unhosted Wallet-4 on or about September 27, 2012 were transferred from Unhosted Wallet-4 to the Chefkolonel Mt. Gox Account. In this way, the Chefkolonel Mt. Gox Account came to hold the proceeds of DRamsterdam's narcotics sales on Silk Road.

        28. Between on or about October 26, 2012, and March 13, 2013, there were no further deposits into the Chefkolonel Mt. Gox Account.

        29. On or about January 6, 2013, an individual named Maria Boomsma opened an account at Mt. Gox (the "Boomsma Mt. Gox Account"). As part of Mt. Gox's account opening process, Boomsma provided her true name, date of birth, residential address, and email address.

        30. Between on or about January 6, 2013 and February 19, 2013, approximately

855 BTC in narcotics proceeds were transferred from the Silk Road user DRamsterdam's account to the Boomsma Mt. Gox Account.

31.     On or about January 24, 2013, approximately 83 BTC in narcotics proceeds were transferred from the Silk Road user harrynak's account to the Boomsma Mt. Gox Account.

32.     By on or about February 24, 2013, all of the BTC in the Boomsma Mt. Gox Account traceable to DRamsterdam and harrynak's narcotics sales on Silk Road were withdrawn from Mt. Gox to a bank account at Rabobank in Boomsma's name.

33.     Between on or about March 7, 2013 and March 13, 2013, approximately 1,570 BTC of the approximately 4,999 BTC traceable to DRamsterdam's narcotics sales on Silk Road that were deposited in the Chefkolonel Mt. Gox Account in or about October 2012 (as described above) were transferred to the Boomsma Mt. Gox Account.

34.     At the time that Mt. Gox shut down and entered liquidation proceedings in Japan in or about February 2014, the Boomsma Mt. Gox Account held approximately 781 BTC in narcotics proceeds. At no point in the months between on or about March 7, 2013—the point at which the Chefkolonel Mt. Gox Account began transferring the proceeds of the Silk Road user DRamsterdam's narcotics sales to the Boomsma Mt. Gox Account—and February 2014—when Mt. Gox shut down—did the value of the funds in the Boomsma Mt. Gox Account, whether held in BTC or fiat currency, dip below the then-current value of approximately 116.69789026 BTC, which, as described below, was the BTC portion of the Mt. Gox distribution received by the Subject Kraken Account.

35.     On or about March 21, 2023, Boomsma opened the Subject Kraken Account. Prior to approving the opening of Subject Kraken Account, Kraken required Boomsma to submit her name and date of birth. This information matches the information that Boomsma provided to

Mt. Gox to open the Boomsma Mt. Gox Account.

36. In or about 2017, the developers of BTC released BCH as a so-called "fork" of BTC, which, among other things, automatically granted to holders of BTC an approximately identical amount of BCH. Accordingly, any BCH derived from the Silk Road user DRamsterdam's narcotics sales that remained in the Boomsma Mt. Gox Account at the time Mt. Gox declared bankruptcy and froze its customers' accounts also constitutes proceeds from the sale of narcotics and property involved in money laundering.

37. Boomsma designated the Subject Kraken Account to receive funds from the Mt. Gox Trustee. On or about July 23, 2024, the Subject Kraken Account received two payments from Mt. Gox totaling approximately 116.69789026 BTC and 16.69788416 BCH—i.e., the Defendants-*in-rem*.

38. On or about July 16, 2024, the Honorable Magistrate Judge Robert W. Lehrburger issued a warrant authorizing the seizure of the Defendants-*in-rem*.

39. Based on the foregoing, there is probable cause to believe that the Defendants-*in-rem* constitute proceeds of narcotics trafficking and property involved in money laundering and monetary transactions involved with criminally derived property (namely, narcotics trafficking).

### IV. **FIRST CLAIM FOR FORFEITURE**

40. Incorporated herein are the allegations contained in paragraphs one through 39 of this Complaint.

41. Title 21, United States Code, Section 881(a)(6) subjects to forfeiture all "moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of [Subchapter I of Title 21], all proceeds traceable to such an exchange, and all moneys, negotiable

instruments, and securities used or intended to be used to facilitate any violation of [Subchapter I of Title 21]."

42. The Defendants-in-rem are subject to forfeiture pursuant to Title 21, United States Code, Section 881(a)(6) because there is probable cause to believe that the Defendants-*in-rem* constitute moneys furnished or intended to be furnished by any person in exchange for a controlled substance and proceeds traceable to such an exchange, in violation of Title 21, United States Code, Sections 841(a)(1) and 846.

## V.    SECOND CLAIM FOR FORFEITURE

43. Incorporated herein are the allegations contained in paragraphs one through 39 of this Complaint.

44. Title 18, United States Code, Section 981(a)(1)(A) subjects to forfeiture "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of section 1956, 1957 or 1960 of this title, or any property traceable to such property."

45. Title 18, United States Code, Section 1956(a)(1)(B)(i) imposes criminal penalties on any person who:

> knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity . . .
>
> knowing that the transaction is designed in whole or in part (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity[.]

46. Under Title 18, United States Code, 1956(c)(7)(A), "specified unlawful activity," includes, among other things, "any act or activity constituting an offense listed in section 1961(1) of this title." Title 18, United States Code, Section 1961(1) lists as an offense

11

"racketeering activity," which includes, among other things, "any act ... dealing in a controlled substance or listed chemical (as defined in section 102 of the Controlled Substances Act), which is chargeable under State law and punishable by imprisonment for more than one year."

47. By reason of the foregoing, the Defendants-*in-rem* are subject to forfeiture to the United States of America pursuant to Title 18, United States Code, Section 981(a)(1)(A), because the Defendants-*in-rem* constitute property involved in monetary transactions that derive from specified unlawful activity, to wit, illegal narcotics trafficking.

WHEREFORE, plaintiff United States of America prays that process issue to enforce the forfeiture of the Defendants-*in-rem* and that all persons having an interest in the Defendants-*in-rem* be cited to appear and show cause why the forfeiture should not be decreed, and that this Court decree forfeiture of the Defendants-*in-rem* to the United States of America for disposition according to law, and that this Court grant plaintiff such further relief as this Court may deem just and proper, together with the costs and disbursements of this action.

Dated: New York, New York
      October 9, 2025

                        JAY CLAYTON
                        United States Attorney for the
                        Southern District of New York
                        Attorney for the Plaintiff
                        United States of America

By: _____
     Benjamin A. Gianforti
     Assistant United States Attorney
     26 Federal Plaza
     New York, New York 10278
     Tel. (212) 637-2490

VERIFICATION

STATE OF NEW YORK              )
COUNTY OF NEW YORK             :
SOUTHERN DISTRICT OF NEW YORK  )

MATTHEW MACCHIAROLI, pursuant to Title 28, United States Code, Section 1746, hereby declares under penalty of perjury that he is a Special Agent with the Department of Homeland Security, Homeland Security Investigations ("HSI"); that he has read the foregoing Verified Complaint and knows the contents thereof; that the same is true to the best of his knowledge, information and belief; and that the sources of his information and the grounds of his belief are his personal involvement in the investigation, and conversations with and documents prepared by law enforcement officers and others.

Executed on October 09, 2025

_____
Matthew Macchiaroli
Special Agent
Homeland Security Investigations